OPINION OF THE COURT
Graffeo, J.
In this appeal we are asked to determine whether the trial court abused its discretion in allowing the introduction of expert testimony by a police officer in a criminal trial regarding the general operating methods and terminology used in street-level narcotics transactions. Under the facts and circumstances presented, we hold that the trial court did not abuse its discretion.
An undercover narcotics police officer working in Bronx County approached a group of approximately five or six men congregating in front of a grocery store and, in an attempt to locate a crack cocaine seller, asked them who was “working the rock.” Commenting on the officer’s disheveled appearance, the group derided the officer as a “crack head” and told him to “get out of here.” Another man then exited the grocery store and *503 called over the officer. The officer remarked that he was “really hurting” for drugs, and in reply, the man indicated that he “understood” and asked the officer what he was looking for. When the officer responded that he was “looking for a little rock,” the man turned and pointed down the street at defendant, stating “see the girl in the orange shirt? She’s working. She [sic] her?”
The officer walked toward defendant and asked if she was selling crack. Defendant began quizzing the officer about whether he had ever before bought drugs in the area. After the officer answered her questions, defendant acknowledged “okay, I got nicks, come on,”* She then led the officer back to the group of men by the store. Again, the men made disparaging remarks to the officer. Joining in their banter, defendant declared that he looked like a cop and that “no one here knows you.” Nevertheless, she asked the officer how much money he had. When the officer told her that he had $20, defendant offered to sell him three bags, advising him she would keep the fourth for herself. The officer agreed, paid defendant $20 in prerecorded buy money and received three bags of what later tested positive as cocaine. As he walked away, the officer turned and observed that defendant remained with the group of men near the grocery store.
After completing the transaction, the officer radioed his back-up team that he made a “positive buy” and described defendant as an African-American female dressed in a bright orange shirt with a blue baseball cap. Another officer arrived at the scene minutes later and discovered defendant, who matched the description. About five minutes after the drug purchase, the undercover officer made a drive-by confirmatory identification of defendant as the seller. Defendant was placed under arrest and searched; however, no prerecorded buy money or drugs were recovered from her person. Because the site of the transaction was within 1,000 feet of two schools, defendant was charged in an indictment with, among other counts, criminal sale of a controlled substance in or near school grounds (Penal Law § 220.44 [2]).
In his opening remarks to the jury, defense counsel suggested that because no drugs or marked money were found on defendant, her arrest was a “mistake” by the police. In response to this misidentification defense, and after presenting *504 the testimony of the undercover and arresting officers, the prosecution sought to call an expert witness, a police sergeant who was not a participant in the drug transaction but had an extensive background in drug enforcement and training. The People intended to offer the sergeant’s testimony to assist the jury in understanding a key issue — why an individual who was accused of selling drugs to an undercover officer might not have either the drugs or prerecorded buy money on his or her person even if arrested soon after the transaction. Defendant objected on the ground that an adequate foundation had not been established for the admission of such testimony. After an extensive colloquy during which the trial court discussed the purpose of the testimony, the voir dire of the sergeant proceeded and the court found the witness to be an expert “in the area of street level narcotics.” Before allowing the sergeant to testify, the court gave the jury cautionary instructions concerning the limited purpose of the testimony, emphasizing that it was not being offered as evidence of what actually happened on the day of defendant’s arrest.
Under direct examination by the prosecutor, the sergeant stated that he was not present when defendant made the sale and was arrested. In describing street-level narcotics transactions, he referred to the different roles and functions performed by persons commonly involved in street drug sales and how these individuals work together. A “pitcher” was described as the person who physically hands a buyer the drugs; a “money man” handles and protects the money; a “stash man” is responsible for safeguarding and handling the supply of drugs; a “lookout” watches for police and other threats; a “steerer” directs buyers to particular sellers based on what drug a potential buyer is seeking; and a “manager” oversees all these persons. The sergeant also defined certain terminology used by drug sale participants such as “are you working,” “stash” and “nicks.”
Explaining why buy money and additional drugs are not always recovered by the police in street-level narcotics arrests, the sergeant testified that the members of a narcotics street operation will try to “save the money by moving it, secreting it somewhere else, getting it off the street before [the police] get there * * * so they do everything they can to keep the money from not staying too long in the street or the drugs from staying too long in the street where it can be seized.” During cross-examination, the witness conceded that one of the reasons why a person arrested might not be in possession of drugs or prere *505 corded buy money at the time of arrest is that the individual may have been misidentified and wrongly arrested.
Ultimately, defendant was convicted of criminal sale of a controlled substance in or near school grounds and sentenced to a term of 2 to 6 years in prison. The Appellate Division affirmed the conviction. A Judge of this Court granted defendant leave to appeal and we now affirm.
In People v Lee (96 NY2d 157, 162 [2001]), we recently restated the long-standing general rule that “the admissibility and limits of expert testimony lie primarily in the sound discretion of the trial court.” The role of the trial court is to “determine when jurors are able to draw conclusions from the evidence based on their day-to-day experience, their common observation and their knowledge, and when they would be benefited by the specialized knowledge of an expert witness” (People v Cronin, 60 NY2d 430, 433 [1983]). In other words, the trial court must decide whether, depending on the facts of each case, the proffered expert testimony would be helpful in aiding a lay jury reach a verdict (see Lee, 96 NY2d at 162; People v Taylor, 75 NY2d 277, 288 [1990]). As part of this process, the purpose for which the expert testimony is being offered must be examined (see Taylor, 75 NY2d at 292).
Here, defendant’s primary defense was misidentification. As the basis of that claim, defendant relied on the fact that no prerecorded buy money or drugs were recovered. By presenting testimony regarding the general characteristics and operating methods of street-level drug transactions, the prosecution offered one plausible explanation as to why a person might not possess money or drugs shortly after selling narcotics to an undercover officer; defendant offered another.
Although the average juror may be familiar with the reality that drugs are sold on neighborhood streets, it cannot be said that the average juror is aware of the specialized terminology used in the course of narcotics street sales or the intricacies of how drugs and money are shuttled about in an effort to prevent their discovery and seizure by the police (cf. Lee, 96 NY2d at 162; Cronin, 60 NY2d at 433; Selkowitz v County of Nassau, 45 NY2d 97, 102 [1978]). Testimony of this nature, from a source other than the undercover officer (a fact witness), may be helpful to the jury in understanding the evidence presented and in resolving material factual issues (accord State v Berry, 140 NJ 280, 302, 658 A2d 702, 713-714 [1995]; United States v Diaz, 878 F2d 608, 616-617 [2d Cir], cert denied 493 US 993 [1989]). *506 Just as in People v Taylor (75 NY2d at 292-293), where we permitted the introduction of expert testimony regarding rape trauma syndrome in order to dispel juror misconceptions regarding the behavioral responses of rape victims, the expert testimony in this case was admitted to explain what might seem, to a lay observer, to be an anomalous fact — that someone who allegedly sold drugs to an undercover officer did not have money or drugs when arrested shortly thereafter.
When a trial court finds that expert testimony is appropriate, it is incumbent on the judge to determine the scope and extent of the testimony to be offered in light of the evidence before the jury. Here, despite a general objection to the People’s offer of expert testimony, defendant did not object to the limiting instruction, nor did she seek to limit the scope of the sergeant’s testimony in any way. As to the latter, the court nevertheless properly precluded the sergeant from opining that defendant sold drugs to the undercover officer or even that defendant’s specific actions or behavior were consistent with participation in a street drug sale (cf. United States v Boissoneault, 926 F2d 230, 233 [2d Cir 1991]).
Based on our concern that expert testimony be admitted only for a permissible purpose, we hold that this type of testimony must be paired with appropriate limiting instructions. If and when the trial court allows such testimony, it should inform the jury that it is free to reject it and that the testimony being admitted should in no manner be taken as proof that the defendant was engaged in the sale of narcotics. These crucial instructions should be reemphasized in the concluding charge to the jury.
We caution that such expert testimony is not necessarily proper in every drug sale case where a defendant asserts a misidentification defense. Indeed it would be perverse if the very absence of drugs or marked money on the accused served as an automatic basis to introduce expert testimony addressing the general characteristics of street drug transactions. But in this case we disagree with the dissent’s conclusion that there was an inadequate factual basis to allow expert testimony on the nature of street-level narcotics transactions. Specifically, the undercover officer detailed the sequence of events and the interactions of the various individuals he encountered before, during and after the cocaine sale. He testified that after he asked the group of men standing by the grocery store who was “working the rock,” a man exited the store, called him over and pointed defendant out as someone who was “working.” The offi *507 cer then approached defendant and inquired about the purchase of crack. Defendant acknowledged she had “nicks” and led the officer back to this group of men. Once at the street corner, she conversed with the group in evaluating the officer before finally selling him three packages of crack. She then remained with the men after the sale was consummated. Given this evidence, the trial court did not abuse its discretion in permitting the expert’s testimony.
We next turn to defendant’s Batson contention (see Batson v Kentucky, 476 US 79 [1986]). It is well settled that, in order to establish a prima facie case of discrimination in the selection of jurors under Batson, a defendant asserting a claim must show that the exercise of peremptory challenges by the prosecution removes one or more members of a cognizable racial group from the venire and that facts and other relevant circumstances support a finding that the use of these peremptory challenges excludes potential jurors because of their race (see People v Childress, 81 NY2d 263, 266 [1993]). When these showings are made, the burden shifts to the prosecution to come forward with a race-neutral explanation for its peremptory challenges.
“There are no fixed rules for determining what evidence will * * * establish a prima facie case of discrimination” (People v Bolling, 79 NY2d 317, 323-324 [1992]). A disproportionate number of strikes used against members of a particular racial or ethnic group may be indicative of a discriminatory pattern, but such a fact is rarely conclusive in the absence of other facts or circumstances. In Bolling, for example, the Batson objection was grounded in both a numerical argument — that the prosecution peremptorily struck four of five African-Americans in the panel — and on the basis that two of the four jurors excused by the People had proprosecution backgrounds. Taken together, this Court found these arguments sufficient to shift the burden to the People (see id. at 325). The absence of other evidence indicating that peremptory challenges were exercised for discriminatory purposes was a consideration in People v Steele, the companion case to Bolling (79 NY2d 317 [1992]). Although three of four prosecution challenges excused African-Americans in Steele, “that alone [was] not sufficient to establish a pattern of exclusion of African-Americans” (id. at 325). Similarly, in Jenkins and Childress, where no showing was made beyond the disproportionate number of strikes of African-Americans, defendants’ claims fell short of the requisite burden (People v Jenkins, 84 NY2d 1001, 1003 [1994]; Childress, 81 NY2d at 267).
*508 We join our dissenting colleague fully in his condemnation of invidious discrimination in jury selection. In this case, however, defendant’s reliance on the People’s removal of seven African-Americans through the exercise of eight peremptory challenges was inadequate, without more, to require the trial court to find a prima facie showing of discrimination. After defendant raised her Batson challenge during the second round of voir dire, the Judge stated that, by his count, nine potential jurors in the first panel and six in the second panel appeared to be African-American and as such the People had challenged 7 of the 15 African-Americans in the venire. Further, four of the seven sworn jurors were African-American.
Defendant was explicitly invited by the trial court to articulate any facts and circumstances that would support a prima facie showing of discrimination. Instead of making “a record comparing Caucasians accepted with similarly situated African-Americans challenged, or by establishing objective facts indicating that the prosecutor has challenged members of a particular racial group who might be expected to favor the prosecution because of their backgrounds” (Bolling, 79 NY2d at 324), defense counsel responded that certain persons excused by prosecution peremptories had no prior jury service or had attended college and, thus, gave no indication that they could not be “fair.” Based on the numbers and arguments presented, the trial court ruled that it did not find a discriminatory pattern. No further Batson objection was raised during the remainder of voir dire proceedings. Upon this record, we conclude that defendant’s numerical argument was unsupported by factual assertions or comparisons that would serve as a basis for a prima facie case of impermissible discrimination (see Jenkins, 84 NY2d at 1003; Steele, 79 NY2d at 325).
Accordingly, the order of the Appellate Division should be affirmed.

 Trial testimony revealed that a “nick,” or “nickel bag,” is a quantity of drugs sold for $5.