THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v OSVALDO MADERA, Appellant. [808 NYS2d 181]—

Judgment, Supreme Court, New York County (Carol Berkman, J.), rendered April 19, 2002, convicting defendant, after a jury trial, of burglary in the second degree, and sentencing him to a term of 10 years, unanimously reversed, on the law, the facts and as a matter of discretion in the interest of justice, the judgment vacated, and the matter remanded to the Supreme Court for a new trial before a different Justice.

Testimony elicited at trial indicates that at approximately 7:00 A.M. on July 27, 2001, defendant rang the apartment doorbell of Anna Nunez. Nunez testified that she looked through the peephole and saw defendant, who was saying something which she could not understand, and also saw her neighbor, Grace Albanese, who was 88 years old at the time, opening the door to her apartment. Nunez then heard Albanese "crying" and observed defendant placing his hand over her mouth.

Albanese testified that she was awakened by someone pounding on her door and when she asked who it was, defendant replied that he was the "super's son." Albanese then opened the door and defendant pushed his way in, pinned her hands behind her back and, when she screamed, put his hand over her mouth. Albanese stated that when she continued to scream, defendant pushed her toward the back of the apartment into the bedroom and sat her down on the bed. Nunez, in the interim, woke her husband, explained what happened, and had their son call the police, who arrived three to five minutes later.

New York City Police Officers Kevin Rivera and Luke Sullivan were the first to arrive and, as they climbed the stairs, they heard a woman calling for help. The officers banged on Albanese's door and yelled "police," for approximately one minute, but got no response, at which time Officer Rivera went through a neighbor's apartment and onto a fire escape. Officer Sullivan, and other officers who had subsequently arrived, continued to bang on the door while Officer Rivera stepped in front of Albanese's window and pointed his gun into the bedroom. Defendant, who appeared shocked, obeyed Officer Rivera's order and began attempting to open the window, while Albanese opened the front door and let the other officers in. Officer Sullivan, upon searching defendant at the precinct, found a small plastic bag containing cocaine residue in defendant's wallet.

Defendant's twin brother, Hector Madera, testified that defendant became nervous and panicky when he was high and drunk and in the months before the incident, he noticed that defendant was regularly high on cocaine and alcohol. Yesenia Hernandez averred that she knew defendant "from the block" and that on the night before the incident, defendant appeared "hyped up," "strange," and was talking to himself. Defendant was purportedly consuming beer and alcohol, left the group a couple of times and when he returned, he was "hyped up."

Defendant testified that on July 26, 2001, he bought cocaine at approximately 11:30 P.M. and used the cocaine and also some of his friends' cocaine. Defendant maintained that he also drank about six beers and, at about 5:00 A.M., went to visit his friend Luis. While in the vestibule of Luis's building, defendant heard a "pop" and then, after looking around, saw a bullet hole in the glass door of the lobby. Defendant claimed that he believed someone was "after" him, so he walked out of the building but was too frightened to take a train home. Defendant then went to his friend Geovany Dipres's building, and was buzzed in by his friend's sister. Defendant heard the elevator while in the lobby of the building but, fearing who might be on it, ran up the stairs.

Dipres arrived at the apartment about 15 minutes later and, finding defendant standing outside his door, invited him in. Dipres testified that defendant looked high on drugs and was acting "kind of paranoid" and "crazy." Dipres had to go to work and, not wanting to leave defendant in the apartment with his three sisters and an aunt, told him to leave several times, but he refused. Dipres then decided to try to scare defendant out and, having been told by defendant that he had heard

a gunshot, Dipres threatened to show defendant a gun. Defendant testified that he believed Dipres was threatening to kill him and he became frightened, started screaming, and ran further into the apartment. Defendant then began to beg Dipres's aunt not to force him out, and the aunt testified that she had never seen defendant so nervous and scared. Dipres and a friend, Edquin Figueroa, finally carried defendant out of the apartment.

Defendant claimed that he believed Dipres and Figueroa were waiting to kill him, so he jumped from a second floor fire escape to the ground, ran over a fence and into another building. Defendant stated that he ran to the roof of that building, took a door to another building and went inside. Defendant testified that he sat for a moment and heard a door open and someone coming up the stairs "quietly." Defendant believed that it was "the killer" so he began to knock on apartment doors. As he banged on one door, a woman asked who was there, and he said it was the super's son. Albanese then opened the door, and defendant pushed his way inside. Defendant stated that he wanted help and protection, was in fear for his life, and did not intend to hurt or sexually assault Albanese or steal anything from her apartment. Defendant purportedly asked Albanese for help, but she began screaming, so he covered her mouth so the killer would not hear her, and moved her away from the door to the back of the apartment.

Defendant testified that he then heard a knock on the window, and he lifted the blind and saw Officer Rivera. Defendant stated that as soon as he saw the officer's uniform, he felt safe and began to open the gate. At the same time, Albanese opened the apartment door and other officers entered and arrested defendant.

Defendant was arraigned on August 15, 2001, and on September 21, 2001, defense counsel served notice of intent to present psychiatric evidence (*see* CPL 250.10 [1] [c]). Counsel notified the court that due to the events of September 11, 2001, she had been unable to access her computer, and was therefore unable to file the notice within the 30-day limit. The affirmation attached to the notice asserted that the psychiatric evidence was proffered to negate the element of intent to commit a crime inside the apartment, in that defendant's "intent in entering the complainant's residence was to seek refuge from a perceived threat on his life," but that the perceived threat was grounded in defendant's mental disease or defect, rather than reality. Although counsel was unable at this time to offer a diagnosis, she had conferred with Dr. Myles Schneider, who would

be the retained expert, and she reserved defendant's right to amend the notice, subject to psychiatric examination.

On December 10, 2001, due to purported difficulties in obtaining defendant's psychiatric records despite defendant's signed consent forms, counsel moved for so-ordered subpoenas to two hospitals, three schools, the Social Security Administration, and the Police Department. On December 13, 2001, the court declined to sign the subpoenas, noting that subpoenas were not the proper way to get the records.

Counsel thereafter filed an amended notice on January 30, 2002 which, in addition to reiterating that defendant's intent in entering the apartment was to seek refuge from a perceived threat, also indicated that Dr. Schneider had rendered a preliminary assessment of defendant's condition, and concluded that defendant suffered from "polysubstance abuse disorder: primarily cocaine induced-psychotic disorder with delusions."

The court opined that it did not become relevant for a doctor to testify to paranoid ideations until some evidence was submitted which indicated that it was defendant's intent to escape a pursuer. The court continued that "in other words, you can't just put the doctor on. I know Dr. Schneider is a wonderful witness, intelligent, nice man, the kind to testify about fancy-dancy things and tell us what he thinks the defendant might have thought at that time to insulate him from cross-examination and put hearsay before the jury." The court also noted that if somebody said he ran because someone was chasing him, "anybody can understand that without an expert," and the court was "left with the abiding conviction that this is really a phony non-issue. Your client is free to . . . explain his state of mind in some other fashion . . . But this is not rocket science."

On February 1, 2002, counsel filed an offer of proof which indicated that defendant would testify that he believed his life was in danger when he entered the victim's apartment, and it was his intent to seek refuge, rather than to commit a crime. The papers also included a DSM diagnosis, based on Dr. Schneider's preliminary assessment of "polysubstance abuse disorder: primarily cocaine induced-psychotic disorder with delusions," including symptoms of paranoia, and further stated that the disorder was beyond the ken of the average juror.

The court, on or about February 7, 2002, issued its order precluding defendant from offering psychiatric evidence relating to the delusions caused by defendant's drug use. The court stated, inter alia, that: "[I]t is clear from the submissions thus far that the defense in this case is essentially that defendant is a drug addict who, at the time of the offense, was suffering

from either drug-intoxication or drug-withdrawal with consequent drug-induced delusions. The 'mental illness' of drug addiction is widely seen and commonly understood and hardly necessitates complex psychiatric exploration, or explanation. *It might also be argued that the average juror is familiar with even the more extreme consequences of drug or withdrawal induced delusions. Leaving aside personal experiences, articles in the print-media and television documentaries, movies such as* Reefer Madness (1936), The Lost Weekend (1945), *and more currently,* Basketball Days (1995), Fear and Loathing in Las Vegas (1998) *and* Blow (2001) *have all featured psychotic-type episodes connected with substance (including cocaine) abuse or withdrawal"* (emphasis added). The court felt that all an expert could do is put a scientific label on it, which could "easily confuse a jury into thinking that the scientific analysis was largely objective, which psychiatric examination is not."

On March 5, 2002, counsel requested a two-week adjournment to submit an amended proof "largely to delineate for the court the factual context of the defense to try to address the concerns with relevance and materiality." The court stated that it didn't know what drugs defendant took, and that once the court knew, or the jury knew, "what kind of drugs he took, [the court] suppose[d] some expert might come in and say this kind of affect [*sic*] or this kind of behavior consistent or inconsistent," but the label would still be irrelevant. The court didn't want "any hocus-pocus in front of the jury" and, ultimately, the court refused the defense request, finding it was basically propensity evidence.

Counsel submitted a final amended offer of proof on March 8, 2002, including a psychiatric report by Dr. Stephen Billick, diagnosing defendant as having a psychotic disorder with delusions. Dr. Billick's report was based on a two-hour interview with defendant, a two-hour interview with defendant's brother, review of defendant's arrest record, review of hospital records of four separate hospitals in which defendant had previously been a patient, and a Minnesota Multiphasic Personality Inventory (MMPI). The report included, among other things, defendant's recitation of his drug and alcohol abuse history, and his version of the alleged offense. Dr. Billick found defendant's thoughts, with regard to the incident, to be "logical except for his fixed paranoid delusional belief that someone was plotting to kill him." The report also noted that defendant had twice sought hospital treatment after using cocaine, and had been diagnosed as having a "paranoid episode due to cocaine use." Dr. Billick diagnosed defendant with "Cocaine Induced Psychotic Disorder

and Delusions," and found that defendant's MMPI score was "consistent with 'substance induced paranoia.' " Dr. Billick further opined that, as a direct result of defendant's condition, including his paranoid persecutory delusions, defendant entered the victim's apartment "only to seek temporary refuge . . . from his paranoid perceived attackers . . . . He did not intend to rob, hurt or rape her. He intended to protect himself from the gunman." On March 11, 2002, the court adhered to its prior determination.

The court, prior to trial, clarified its ruling, stating that "no evidence will be permitted that the defendant is suffering from a mental illness. Indeed, the relevance escapes me." The court also noted that defendant's mental illness was drug addiction, so the court didn't want to "make a big mystery of this mental illness." The court also noted that Dr. Billick had not said that defendant *could not* form the intent to commit a crime in the apartment, but that he *did not* form the intent, and found this inadmissible.

During the course of the trial, the defense intended to call Dr. Billick to testify within the limits the court had set, which limits were not entirely clear, except that he could not testify to a diagnosis or refer to his interviews with defendant or with defendant's family or friends, and there could be no reference to mental illness because the case was about drug addiction, not mental illness. At trial, when the prosecutor objected to the defense having defendant's brother testify about defendant's drug addiction, the court stated: "I'm presuming that Dr. Billick . . . will testify that if you are . . . a drug addict, that you take a lot of drugs or various substances that you can have a psychotic episode. So the offer will be the issue as to whether the defendant was a drug addict . . . is irrelevant." The prosecutor understood the court's decision to be that Dr. Billick could testify to the effect cocaine could have on a person generally, but not about this defendant, and no diagnosis. The court agreed with this understanding, and the court also precluded defendant's prior hospital records on the ground that using cocaine to excess on prior occasions did not establish that he used it on this occasion.

Finally, when the defense was about to call Dr. Billick, the prosecutor objected to his testimony because there had been insufficient foundation laid. That is, defendant did not testify as to how much cocaine he used that night. Defendant's counsel noted that the cross-examination of defendant had focused on the reasonableness of defendant's belief that he was being pursued, and the expert would discuss whether defendant's

behavior was or was not consistent with defendant's paranoia associated with his condition. Counsel also noted a common misconception, that the amount of cocaine is determinative of the psychotic reaction, including delusions, and argued that the expert could testify as to how, even in a delusional state, defendant could intentionally lie to gain entrance to Albanese's apartment.

The court stated that when it wrote its original decision, it "was picturing a real description of a real psychotic state going on here, which you know . . . like snakes crawling down the wall and stuff like that." The court didn't see "why the jury needs the doctor to put some fancy-dancy label on all of this; he says he was scared and that's why he did it, why can't they evaluate his credibility without this." Thus, the court precluded the expert testimony.

Generally, the admissibility and boundaries of expert testimony lie primarily within the sound discretion of the trial court (*People v Brown*, 97 NY2d 500, 505 [2002]; *People v Williams*, 97 NY2d 735 [2002]). The role of the trial court in the first instance is to "determine when jurors are able to draw conclusions from the evidence based on their day-to-day experience, their common observation and their knowledge, and when they would be benefitted by the specialized knowledge of an expert witness" (*People v Cronin*, 60 NY2d 430, 433 [1983]; *see also People v Lee*, 96 NY2d 157, 162 [2001]). In rendering its decision, the "courts should be wary not to exclude such testimony merely because, to some degree, it invades the jury's province" (*id.*). Indeed, the Court of Appeals has opined, and reaffirmed, that "[e]xpert opinion testimony is used in partial substitution for the jury's otherwise exclusive province which is to draw 'conclusions from the facts.' . . . It is a kind of authorized encroachment in that respect" (*People v Jones*, 73 NY2d 427, 430-431 [1989], quoting *Cronin*, 60 NY2d at 432; *see also Lee*, 96 NY2d at 162).

In this matter, the trial court apparently concluded that the average juror was capable of understanding drug-induced delusional states and, in reaching that conclusion, relied on unidentified articles in the print media, unnamed television documentaries, and such movie titles as *Reefer Madness* and *Fear and Loathing in Las Vegas*. We find, however, contrary to the trial court's holding, that the ability of narcotics, specifically cocaine, to produce a psychotic, delusional and paranoid state in which defendant could truly believe his life was in danger, despite minimal, if any, evidence of such danger, would not be within the ken of the average juror. Indeed, absent such

testimony, the jury was likely left to conclude that no reasonable person would presume that some unknown person was chasing him and trying to kill him merely because he thought he heard a "pop" and observed a hole in a glass door (*see People v Real*, 137 AD2d 416 [1988]). Concur—Andrias, J.P., Marlow, Sullivan, Ellerin and Nardelli, JJ.