**James TRUESDALE, Petitioner,**

v.

**John SABOURIN, Superintendent,**
**Respondent.**

**No. 04 Civ. 5455(DLC).**

United States District Court,
S.D. New York.

April 19, 2006.

Lawrence T. Hausman, Robert Budner, The Legal Aid Society, New York, NY, for Petitioner.

Hae Jin Liu, Assistant District Attorney, Office of the District Attorney, Bronx, NY, for Respondent.

## OPINION & ORDER

COTE, District Judge.

James Truesdale, an inmate at Bare Hill Correctional Facility in Malone, New York, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The sole issue presented in his petition is whether the state trial court violated his Fourteenth Amendment right to equal protection as interpreted by the Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

### Background

The following facts are drawn primarily from the Report & Recommendation of Magistrate Judge Gorenstein, except where noted. No objections were made to any factual conclusions drawn by the Magistrate Judge.

Truesdale was indicted in Bronx County in connection with the robbery and assault of two security guards in October 1995. The indictment charged Truesdale with robbery, attempted robbery, assault, burglary, criminal possession of stolen property, and criminal possession of a weapon. The State alleged that Truesdale, in concert with some cohorts, pushed his way into a lighted security booth occupied by residential security guards, and proceeded

to assault one of them, steal from another, and threaten both.

Jury selection in his trial before Justice Denis Boyle began on May 28, 1998.[1] The defense and prosecution were each granted fifteen peremptory challenges for the selection of twelve jurors, and an additional two peremptory challenges for the selection of two alternates. *See* N.Y.Crim. Proc. Law § 270.25(2)(b). The trial court employed a "jury box" system for selecting jurors. Under this method, fourteen prospective jurors were seated in the jury box for voir dire. As for—cause and peremptory challenges were exercised, members of the first round of fourteen were either selected as jurors or dismissed. The jury box was then re-filled with another round of fourteen prospective jurors and the process is repeated until all jurors and alternates are selected. See Transcript of Proceedings before Hon. Denis Boyle in New York Supreme Court, Bronx County, on May 28, 1998, Mar. 1–3, 1993, at 126–27.

In the first round, three jurors were excused for cause with the parties' consent, leaving eleven prospective jurors. Of these eleven, ten were black. The State exercised five peremptory challenges, and the defense exercised two; all of the challenged jurors were black. This left four jurors (three black, one non-black) from the first round to be selected for the petit jury.

Fourteen new members of the venire were seated in the jury box for the second round. After challenges for cause, eight remained (four black, four non-black). The State challenged three peremptorily. Once again, all of the prospective jurors challenged by the State were black.

It was at this point that Truesdale's co-counsel made a *Batson* challenge.[2] The defendants' argument was presented as follows:

> Your Honor, before we have a peremptory challenge, we have a *Batson* [challenge]. Every single one of jurors challenged by the People so far have been black. The People have specifically skipped over in their challenge in this specific rounds [sic] ... [four] white people. Everyone we've picked up has been black. The first round and in this round, Judge. And Mr. Freeman in this round is the only black that he didn't challenge and he is a security guard, which, of course, Your Honor knows that their chief witness is a security guard I think [they're] banking on the fact there's some affinity there.

Co-counsel for both defendants joined in the motion.

The judge then asked the prosecutor if defense counsel had made a *prima facie* case for his claim of discrimination. The prosecutor denied that a case had been made, arguing that the State had not challenged three black members of the venire who had been selected for the jury. The prosecutor further volunteered an explanation for some, but not all, of his peremptory challenges. He concluded by asserting that his peremptory challenges had "not been based on racial lines at all."

Defense counsel responded by arguing that the proper focus under *Batson* is on the prospective jurors who have been challenged, not on those who were not challenged. Thus, what mattered for present purposes, counsel argued, was that "the

---

1. Truesdale was tried along with two co-defendants.

2. The trial court had requested that one defense attorney speak for all three during the voir dire. Counsel for one of Truesdale's co-defendants volunteered to speak on behalf of all defendants.

challenges that were exercised [were] 100 percent African–American challenges." After defense counsel asserted that there "appear[ed] to be no discernable or articulable reason other than the racial composition" for the State's pattern of strikes, the prosecutor objected that "all of the jurors available" in the first round "were non-white." Defense counsel countered and the court agreed that one juror in the first round was "not an African–American."

The court then proceeded to make a record and rule on defense counsel's motion:

> [U]pon consideration of defendants' *Batson* challenge, I would note that in first panel, there were ten African–American prospective jurors out of a total of eleven available for challenges—available for peremptory challenges, I should say. Of that group, the People exercised three out of seven. In the second panel, of the first eight, there are four African–American jurors totalling fourteen African–American jurors out of a total of nineteen. Of these, People have challenged a total of six. When measured with all the information provided me, I conclude first that neither the percentage of peremptories in themselves or any other facts relied upon by the defendants satisfy me that a *prima facie* case of discrimination on the People's part has been made out. I would note somewhat parenthetically as to Ms. Heins, the record at a minimum, verged on a challenge for cause as to her and I see no pattern of discrimination and defendants['] *Batson* objection is overruled.

It is undisputed that the trial court erred in its count of peremptory challenges made by the State in the first round. The State exercised five (not three) challenges in the first round, and there were eight (not six) challenges made at the time of defendants' *Batson* argument. Defendants did not raise their *Batson* claim again at the close of voir dire, and the racial composition of the rest of the venire and jury was not noted for the record.

The jury convicted Truesdale of second-degree robbery, N.Y. Penal Law § 160.10(1), two counts of attempted second-degree robbery, N.Y. Penal Law §§ 110 & 160.10(1), second-degree assault, N.Y. Penal Law § 120.05(2), and fifth-degree criminal possession of stolen property, N.Y. Penal Law § 165.40. He was sentenced on August 5, 1998, principally to ten years on the robbery count.

Truesdale appealed his conviction to the Appellate Division, First Department, arguing *inter alia* that he "was denied his federal and state rights to due process and equal protection where, even though the prosecutor had exercised all eight of his challenges against African–Americans, the court denied [his] *Batson* claim without requiring the prosecutor to supply race-neutral reasons for all of the challenges." The Appellate Division affirmed the conviction. With respect to the *Batson* argument, the Appellate Division held that

> Defendant's application pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was properly denied since he failed to establish a prima facie case of discrimination. See *People v. Brown*, 97 N.Y.2d 500, 507–08, 743 N.Y.S.2d 374, 769 N.E.2d 1266 (2002). Given the racial composition of the panel, defendant's numerical argument was not so compelling as to be conclusive by itself, and it was not corroborated by any other evidence. See *People v. Miller*, 298 A.D.2d 194, 748 N.Y.S.2d 50 (1st Dep' t 2002).

*People v. Truesdale*, 299 A.D.2d 289, 750 N.Y.S.2d 69, 70 (1st Dep't 2002). Leave to appeal to the New York Court of Appeals was denied on April 23, 2003.

This petition for a writ of habeas corpus was timely filed on July 14, 2004. Truesdale raises only one ground for relief, that he "was denied [his] right to equal protection under the law when, during the jury selection, the Prosecutor exercised a statistically significant pattern of peremptory challenges to exclude African Americans." He argues that the state courts' rejection of his *Batson* challenge represented an unreasonable application of Supreme Court precedent.

Magistrate Judge Gorenstein concluded in his Report and Recommendation that Truesdale's petition should be denied. After dismissing the State's argument that Truesdale had failed to exhaust some of his statistical arguments, Judge Gorenstein addressed the merits of Truesdale's *Batson* arguments.

The Report and Recommendation relied on two statistical arguments to support its conclusion. First, Judge Gorenstein compared the State's "actual strikes ... with the number of strikes that would have been expected had there been no discrimination at all," given the racial composition of the venire. The State exercised 100% of its peremptory challenges against black prospective jurors, higher than the strike rate of 74% that would be expected if challenges were exercised randomly against the same pool of prospective jurors (74% of the venire was black). Although the rate of actual strikes was 36% higher than the expected rate, Judge Gorenstein observed that the disparity between the two was smaller than the disparity found by the Second Circuit to create an inference of discrimination in *United States v. Alvarado*, 923 F.2d 253, 255 (2d Cir.1991).

Consequently, Judge Gorenstein concluded, the New York courts had not "unreasonably applied" Supreme Court precedent when they denied Truesdale's *Batson* motion.

"[L]oathe to rest its analysis solely on the comparison of raw percentages that is typically undertaken," the Report and Recommendation offered a second statistical argument to support its conclusion. Judge Gorenstein noted that mere comparison of percentages could not indicate the likelihood that the actual pattern of strikes was truly due to chance. This likelihood could be measured, however, by assessing the statistical significance of the disparity between the actual strike pattern and the predicted pattern. This in turn can be done by measuring the deviation of the actual pattern from the norm. If the deviation exceeded "two or three" standard deviations, Judge Gorenstein explained, the Court could be sufficiently confident that the actual pattern of strikes was sufficiently unlikely to be due to chance to raise an inference of discrimination. In this case, the actual number of strikes differed from the expected number by 2.11 (8 actual challenges minus 5.89 expected), or 1.69 standard deviations—not enough to raise an inference of discrimination for Judge Gorenstein.[3]

*Discussion*

A. Exhaustion

The federal habeas corpus statute, 28 U.S.C. § 2254(b) & (c), codifies the "long-established principle that a state prisoner seeking federal habeas review of his conviction ordinarily must first exhaust avail-

---

**3.** Judge Gorenstein did note, though, that this number exceeded the 1.5 standard deviations he calculated based on the facts in *Alvarado*, which had been the benchmark for the previous argument. The Report and Recommendation attributed the outcome in *Alvarado*, which was contrary to what its standard deviation analysis would dictate, to the fact that the Court of Appeals was sitting in direct review of a trial conducted in a federal district court, to which it owed no special deference.

able state remedies." *Daye v. Attorney General of the State of New York,* 696 F.2d 186, 190 (2d Cir.1982). The exhaustion rule requires a federal court to "ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, *i.e.,* whether he has fairly presented his claims to the state courts." *O'Sullivan v. Boerckel,* 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *see also Daye,* 696 F.2d at 191.

Respondents object to Judge Gorenstein's conclusion that Truesdale had satisfied the exhaustion requirement of the federal habeas statute. They renew their argument that because Truesdale did not present some of his statistical arguments to the state trial and appellate courts, these arguments are "unexhausted but should be deemed exhausted but forfeited," by which they presumably mean that the arguments are procedurally defaulted. For the reasons stated in Judge Gorenstein's Report and Recommendation, Truesdale has satisfied the exhaustion requirement, and more specifically has not procedurally defaulted on his claims.

## B. The Merits of the *Batson* Claim

A federal court may issue a writ of habeas corpus pursuant to the federal habeas statute "if the petitioner establishes that the adjudication of his or her claim in state court resulted in a decision that was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Harris v. Kuhlmann,* 346 F.3d 330, 342 (2d Cir.2003) (quoting 28 U.S.C. § 2254(d)(1)).[4] "Clearly established Federal law" means "the holdings, as opposed to the dicta of [the

Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

■ A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." *Id.* at 413, 120 S.Ct. 1495. If the Supreme Court has clearly established the correct evidentiary standard for the consideration of a constitutional claim then a state court's deviation from that standard would be contrary to that law. For example, the Court in *Williams* described a hypothetical scenario in which a state court evaluated an ineffective assistance of counsel claim using a "preponderance of the evidence" standard rather than the "reasonable probability" standard set out in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Court was clear that such a state court decision would be contrary to the Court's clearly established law. *See Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495.

■ If, on the other hand, a state court decision "appl[ied] the correct legal rule from [Supreme Court precedent] to the facts of a prisoner's case," habeas relief would not be available under the "contrary to" clause of the federal habeas statute. *Id.* at 406, 120 S.Ct. 1495 (emphasis added). Any relief from such a decision must be sought instead under the "unreasonable application" provision. A state court decision involves an "unreasonable application" of Supreme Court precedent if the state

---

4. There is no dispute as to whether Truesdale's claim was adjudicated on the merits by both New York state courts.

court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495. The application must be "objectively unreasonable," *id.* at 409, 120 S.Ct. 1495, which "falls somewhere between merely erroneous and unreasonable to all reasonable jurists. Some increment of incorrectness beyond error is required, but that increment need not be great." *Henry v. Poole,* 409 F.3d 48, 68 (2d Cir.2005) (citation omitted).

■ The clearly established federal law governing claims of discrimination in the exercise of peremptory challenges is the Supreme Court's opinion in *Batson v. Kentucky.* *Batson* set out a three-part test that trial courts are to use in evaluating such claims. First, the trial court must determine whether the movant has made out a *prima facie* case of discrimination. *Batson,* 476 U.S. at 96, 106 S.Ct. 1712. Second, once this has been done, the burden shifts to the non-moving party to proffer a race-neutral explanation for striking the potential juror. *Id.* at 97, 106 S.Ct. 1712. Finally, the trial court must determine whether the movant has carried its burden of establishing that the peremptory challenge at issue was based on race. *Id.* at 98, 106 S.Ct. 1712; *see also Harris v. Kuhlmann,* 346 F.3d at 343 (summarizing *Batson*) (quoting *McKinney v. Artuz,* 326 F.3d 87, 97–98 (2d Cir.2003)).

■ Batson also describes the showing that must be made in order to "establish a prima facie case of purposeful discrimina-tion in selection of the petit jury": the movant must "raise an inference that the prosecutor used [peremptory challenges] to exclude the veniremen from the petit jury on account of their race." *Batson,* 476 U.S. at 96, 106 S.Ct. 1712; *see also Johnson v. California,* 545 U.S. 162, 125 S.Ct. 2410, 2416, 162 L.Ed.2d 129 (2005) ("[T]he defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'") (quoting *Batson,* 476 U.S. at 93–94, 106 S.Ct. 1712).[5] A trial court "should consider all relevant circumstances," but the Court specifically noted two likely to be especially significant. First, "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Batson,* 476 U.S. at 96–97, 106 S.Ct. 1712. And second, "the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Id.*

■ Batson further established that the movant's burden in establishing a *prima facie* claim of discrimination is not a heavy one. The opinion directs lower courts to its Title VII jurisprudence, where it had previously "explained the operation of prime facie burden of proof rules." *Id.* at 94 n. 18, 106 S.Ct. 1712; *see also Overton,* 295 F.3d at 279 n. 10 ("The familiar three-step evidentiary framework that the Supreme Court imported into the *Batson* context is derived from the Supreme Court's equal protection and Title VII jurisprudence." (citation omitted)). In *Texas Department of Community Affairs v. Bur-*

---

5. In its original description of the showing needed to establish a *prima facie* case, the Court also stated that "the defendant first must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Batson,* 476 U.S. at 96, 106 S.Ct. 1712 (citation omitted). "These requirements were later eliminated in *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991)." *Overton v. Newton,* 295 F.3d 270, 276 n. 7 (2d Cir.2002).

*dine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), specifically cited in *Batson* as a source of the framework it was applying, the Court held that "[t]he burden of establishing a prima facie case of [discrimination] is not onerous." *Id.* at 253, 101 S.Ct. 1089. This explicit incorporation of *Burdine's* analytic structure into the Batson opinion unequivocally signalled the Court's decision to retain in the jury selection context the minimal threshold required of claimants making a *prima facie* case of discrimination in employment cases in order to shift the burden of production to the non-movant. *See Overton*, 295 F.3d at 279 n. 10 (noting that "the minimal burden put on a defendant to make a *prima facie* showing under *Batson* [ ][is] a burden similar to that placed on plaintiffs in Title VII and equal protection jurisprudence"). The Court has since confirmed the limited nature of the showing required by *Batson* to make a *prima facie* case:

> "We did not intend the first step to be so onerous that a defendant would have to persuade the judge ... that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."

*Johnson*, 125 S.Ct. at 2417.[6]

■ The Appellate Division's opinion measured Truesdale's equal protection challenge against a higher standard than that set out in *Batson* and was therefore contrary to clearly established federal law.[7] The Appellate Division held that Truesdale had "failed to establish a *prima facie* case of discrimination" because his "numerical argument was not so compelling as to be conclusive by itself, and it was not corroborated by any other evidence." *People v. Truesdale*, 750 N.Y.S.2d at 70. To support this conclusion, the court relied on one of its own opinions from which it appears to have drawn the second quote verbatim, as well as an opinion by the New York Court of Appeals holding that "[a] disproportionate number of strikes used against members of a particular racial or ethnic group may be indicative of a discriminatory pattern, but such a fact is rarely conclusive in the absence of other facts or circumstances." *People v. Brown*, 97 N.Y.2d 500, 507, 743 N.Y.S.2d 374, 769 N.E.2d 1266 (2002). The Appellate Division's language and citations reveal a skepticism of arguments based on a pattern of strikes and a requirement that such argu-

6. To be sure, *Johnson* was not clearly established law at the time of Truesdale's conviction. But to the extent that *Johnson* summarizes and confirms the enduring vitality of law that was clearly established at that time, it is a relevant and useful resource.

7. Truesdale did not argue that the Appellate Division's opinion was contrary to federal law, focusing instead on the unreasonable application prong of the habeas statute. Similarly, Judge Gorenstein seemed to assume that the state court had applied the correct legal standard to Truesdale's claim. Truesdale's failure to brief this precise point notwithstanding, the State is not unduly prejudiced by this Court's decision to focus on the correctness of the standard applied by the state court rather than on the reasonableness of its application of that standard. The fundamental question presented by Truesdale's petition is whether the Appellate Division adequately applied Supreme Court precedent. Because this necessarily includes verification that the state courts correctly identified the applicable legal standard, the State was on notice that the correctness of the standard could be a significant issue in this action. Moreover, the State did address this issue, affirmatively arguing in its briefing papers that the Appellate Division "correctly identified the governing Supreme Court requirements to establish a *prima facie* case in a *Batson* challenge."

ments, when presented alone, be sufficiently "compelling as to be conclusive" of discrimination.

*Batson* does not support the differential treatment of claims based on a pattern of strikes and claims based on other forms of evidence. Indeed, as the Second Circuit noted, there can be "no doubt that statistics, alone and without more, can, in appropriate circumstances, be sufficient to establish the requisite prima facie showing under Batson." *Overton,* 295 F.3d at 278. Nor does Batson support a requirement that any argument made at the first step of the Batson inquiry be "compelling" or "conclusive." Such a requirement increases the burden placed on the movant behind a Batson challenge beyond the minimal burden described by the Supreme Court. *Cf. Johnson,* 125 S.Ct. at 2417 (rejecting a requirement that a defendant "persuade the judge ... that the challenge was more likely than not the product of purposeful discrimination").[8]

Moreover, to the extent that the heightened standard applied by the Appellate Division decreases the likelihood that a deserving defendant will be able to move past the first step of the three-step *Batson* inquiry, the potential harm extends beyond infringement of that particular defendant's rights. As the Supreme Court explained in rejecting another attempt to increase the burden on a defendant making a *prima facie* case of discriminatory jury selection,

the *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process.

The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question.

*Johnson,* 125 S.Ct. at 2418. The standard applied by the Appellate Division would result in fewer direct answers being offered to explain statistical disparities that may suffice to give rise to an inference of discrimination but are not so immediately compelling as to lead the trial judge to conclude that discrimination has occurred. The failure to require explanation for suspicious patterns of jury selection could "undermine public confidence in the fairness of our system of justice," and thereby frustrate "the public purposes Batson is designed to vindicate." *Id.* (citation omitted).

█ The heightened showing required by the Appellate Division of habeas petitioners who rely solely on numerical arguments to establish their *prima facie* cases of discrimination "is at odds with the prima facie inquiry mandated by *Batson.*" *Id.* at 2419.[9] Because the Appellate Division's affirmance of Truesdale's conviction applied a legal rule "contrary to ... clearly established Federal law as determine by the Supreme Court," its ruling is not entitled to AEDPA deference. *Henry,* 409 F.3d at 72. "Absent AEDPA deference, conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo.*" *DeBerry v. Portuondo,* 403 F.3d 57, 67 (2d Cir.2005). The state trial court's conclusion that Truesdale did not establish a *prima facie* claim for his *Batson* challenge will therefore be reviewed without deference.

---

8. Thus, the "appropriate circumstances" referred to in *Overton* can mean nothing more than those circumstances sufficient to satisfy the defendant's minimal burden of raising an inference of discrimination.

9. "[I]f the state court's rejection of a claim is grounded on part of a state-law principle that is inconsistent with part of the [Supreme Court's] standard, it meets the AEDPA 'contrary to' test." *Henry,* 409 F.3d at 71–72.

■ When a defendant relies on statistical arguments to establish a *prima facie* case of discriminatory jury selection, "a rate of minority challenges significantly higher than the minority percentage of the venire would support a statistical inference of discrimination." *Alvarado,* 923 F.2d at 255. At the time the *Batson* challenge was made in this case, the rate of challenges against black members of the venire was 100% (8/8), and the percentage of blacks in the venire was 74% (14/19). Black prospective jurors were thus struck at a rate 36% higher than would be expected if peremptory challenges were exercised randomly across the venire. To be sure, this disparity is far below the greater than 100% difference relied upon by the Second Circuit in *Alvarado, id.* at 256, but that case did not purport to, and should not be read to, establish a minimum threshold for *prima facie* claims of discrimination. Were it otherwise, no inference of discrimination would be possible where members of the targeted group compose more than 50% of the venire.

■ Yet unlike the defendant in *Alvarado,* Truesdale does not rely on this statistical disparity alone. He argues that an inference of discrimination is created in this case not only by the fact that the rate of minority challenges was higher than would be expected, but also by the fact that every one of the State's peremptory challenges was used to strike a black prospective juror. It is beyond cavil that the use of peremptory challenges to rid a venire of all members of a racial group will support a *prima facie Batson* violation. *See Harris,* 346 F.3d at 345–46. But the exclusion need not be so systematic: "[a] prosecutor may not avoid the *Batson* obligation to provide race-neutral explanations for what appears to be a statistically significant pattern of racial peremptory challenges simply by forgoing the opportunity to use all of his challenges against minorities." *Alvarado,* 923 F.2d at 256. In other words, the State could not defeat Truesdale's *prima facie* case by pointing out that it did not object to the seating of some black jurors.[10]

At the time the state court judge ruled on Truesdale's *Batson* challenge, the record reflected that the prosecutor used his peremptory challenges to strike only black prospective jurors, and in numbers noticeably disproportional to their representation on the venire.[11] Put another way, the State struck 57% of the eligible black prospective jurors and 0% of the eligible non-

**10.** This fact may be relevant, however, to the ultimate determination of whether Truesdale has established purposeful discrimination in violation of the Fourteenth Amendment. *See Batson,* 476 U.S. at 98, 106 S.Ct. 1712 (explaining that, after the prosecutor articulates a neutral explanation, the trial court must "determine if the defendant has established purposeful discrimination"); *see also Messiah v. Duncan,* 435 F.3d 186, 195 (2d Cir.2006) ("*[Batson's]* third step requires a trial judge to make an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances." (citation omitted)); *Jordan v. Lefevre,* 293 F.3d 587, 595 (2d Cir. 2002) (noting that fact that "two blacks were seated on the jury without the State's using peremptory challenges that remained avail-

able" supported credibility of State's race-neutral justification for other challenges).

**11.** Defense counsel's argument in support of Truesdale's *Batson* challenge was somewhat lacking. While counsel did point out that all of the State's peremptory challenges had been used to strike black prospective jurors, counsel neglected to establish other relevant facts, including the racial composition of the venire. The Second Circuit has made clear that "[d]efense counsel bears the burden of articulating the basis, both factual and legal, for a *Batson* challenge," *DeBerry,* 403 F.3d at 69, and has denied habeas relief where such challenges were made in the absence of a supportive record in the state trial court. *See Overton,* 295 F.3d at 279. In this case, however, the relevant facts were on the record at

black prospective jurors. This is evidence of a pattern of strikes that would "permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 125 S.Ct. at 2417. Truesdale has therefore carried the minimal burden required of him to make a *prima facie* case of discrimination under *Batson*, and the burden should have shifted to the State to provide a race-neutral explanation for its peremptory challenges. The state trial court's failure to move to the second step of the *Batson* inquiry, a decision reviewed here *de novo*, was error.

When a state court fails to fulfill its duties under *Batson*, a federal court sitting in habeas review has three options in its selection of a remedy. The federal court may "(1) hold a reconstruction hearing and take evidence regarding the circumstances surrounding the prosecutor's use of the peremptory challenges ...; (2) return the case to the state trial court on a conditional writ of habeas corpus so that the state court could conduct the inquiry on its own; or (3) order a new trial." *Harris*, 346 F.3d at 347 (citation omitted). There are some limits, however, to the district court's discretion to choose among these remedial options. Most importantly, the Second Circuit has cautioned that "if appropriate findings may be conveniently made" at a reconstruction hearing, "this should be done." *Id.* at 348 (citation omitted). Thus, a district court has the discretion to order a new trial "only where it is demonstrably true that the passage of time has impaired the trial court's ability to make a reasoned determination of the prosecutor's state of mind when the jury was selected." *Id.* (citation omitted).

There do not appear to be any circumstances present that would warrant a finding that no court would be able to make a reasoned determination regarding the prosecutor's reasons for his peremptory challenges. A reconstruction hearing will therefore be held to complete the second and third steps of the *Batson* inquiry. The parties will be invited to argue to the Court whether the hearing should be held before this Court or before Justice Doyle in New York State Supreme Court.

### Conclusion

The standard applied by the Appellate Division in its denial of Truesdale's *Batson* challenge was contrary to clearly established federal law. The trial court's conclusion that Truesdale had failed to establish a *prima facie* case of discriminatory jury selection is consequently reviewed *de novo*. Because there was sufficient evidence in the record to give rise to an inference of discrimination in the State's exercise of peremptory challenges, the trial court's failure to fulfill its obligations under *Batson* was erroneous. A reconstruction hearing will be held to determine whether the State can offer a race-neutral explanation for its peremptory challenges and whether Truesdale can carry his ultimate burden of establishing discriminatory purpose. The parties will be afforded an opportunity to argue the venue of that hearing.

SO ORDERED.

---

the time the state trial judge ruled on Truesdale's motion, having been put there by the judge himself in preparation for his ruling. Any deficiency in counsel's argument was thus effectively cured by the state trial judge. Moreover, because the trial judge in this case ruled on Truesdale's motion after the record

was fully developed, there was no unsupported and previously denied motion for defense counsel to renew. *Id.* Truesdale's situation is quite unlike the petitioner's in *Overton*, where "the trial judge never confronted" the statistical record while a *Batson* challenge was pending. *Id.*